**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SUSAN KEMEN, *individually, and on*
*behalf of all others similarly situated*,

        **Plaintiff,**

      v.

CINCINNATI BELL TELEPHONE
COMPANY LLC, *d/b/a*,
CINCINNATI BELL,

        **Defendant.**

Case No. 1:22-cv-152
JUDGE DOUGLAS R. COLE

### OPINION AND ORDER

On January 23, 2023, the Court granted Defendant Cincinnati Bell Telephone Company LLC's Motion to Dismiss Plaintiff Susan Kemen's Amended Complaint.[1] (Doc. 12, #160–61). The Court found Kemen had not plausibly alleged her cell phone was "residential" but permitted Kemen to seek leave to amend to cure that deficiency. (*Id.* at #157, 160–61). Now Kemen has moved for leave to file her Second Amended Complaint, in which she has supplemented her allegations on that score. (Doc. 13, #162). Cincinnati Bell opposed (Doc. 14), and Kemen replied. (Doc. 16). For the reasons below, the Court **GRANTS** Kemen's Motion. (Doc. 13). But the Court also **ORDERS** Kemen to **SHOW CAUSE** why this Court has Article III standing to grant her requested injunctive relief.

Federal Rule of Civil Procedure 15(a)(2) permits a party to amend only with the opposing party's written consent (not present here), or with leave of court. As to

---

[1] The facts have been detailed in the Court's prior Opinion. (Doc. 12, #149–53).

the latter, although the question is committed to the court's discretion, the "court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In deciding whether to grant leave, courts look to these factors: "delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of argument." *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990) (citation omitted).

As noted, the Court found Kemen's Amended Complaint did not state a claim because—and only because—she had not adequately alleged her cell phone was residential.[2] (Doc. 12, #157). Kemen's proposed Second Amended Complaint added allegations that she does not use her cell phone for business but rather as a personal landline phone and that she registered this number to the national Do Not Call registry in 2011. (Doc. 13-1, #170). With those additions, Kemen has plausibly alleged her cell phone is residential. *See Rose v. New TSI Holdings, Inc.*, No. 21-cv-5519, 2022 WL 912967, at *2 (S.D.N.Y. 2022) (holding a plaintiff plausibly alleged a cell phone is residential where the phone is registered to the national Do Not Call registry and not used for business purposes); *In re Rules & Reg's Implementing the TCPA*, 18 FCC Rcd. 14014, 14039 (July 3, 2003) ("[W]e will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'").

---

[2] The Court requested Kemen supplement other allegations if she could. (Doc. 12, #161). But the Court's holding only concerned whether Kemen's phone was used for residential purposes.

Cincinnati Bell complains that the proposed amendment is nonetheless futile, as Kemen's Second Amended Complaint still has not adequately stated a claim. (Doc. 14, #183–89). Cincinnati Bell is correct that a court can deny a motion to amend as futile if the proposed complaint could not survive a motion to dismiss. *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005). That in turn requires the Court to answer a familiar question—whether the proposed complaint plausibly asserts a claim. And in making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted).

The Court begins its futility analysis with a quick detour through the elements of Kemen's do-not-call claim. Specifically, Kemen asserts a so-called internal do-not-call claim. (*See* Doc. 12, #155–59 (outlining her claim)). To ultimately succeed, she must prove: (1) she is a residential phone subscriber, (2) who received a call made for telemarketing purposes, (3) from an entity that has not implemented the minimum procedures, (4) more than one time in a twelve-month period. *See* 47 U.S.C. § 227(a)(4), (c)(1), (c)(5); 47 C.F.R. § 64.1200(d), (f)(13); (Doc. 12, #157–59). So at the motion-to-dismiss stage, she must plausibly allege that she could succeed on each of these four elements.

Cincinnati Bell levels three plausibility attacks against Kemen's claim. It argues that Kemen's proposed complaint still does not plausibly allege that (1) her

3

phone is residential, (2) Cincinnati Bell called for telemarketing purposes, and (3) Cincinnati Bell lacks adequate internal minimum procedures. (*Id.* at #183–88). Each challenge falls short.

Start with Kemen's phone. Even with her new allegations, Cincinnati Bell maintains that Kemen has not sufficiently alleged her phone is residential. (Doc. 14, #185). Not so. FCC regulations define a "residential subscriber" as a "subscriber to a telephone exchange service that is not a business subscriber." 47 C.F.R. § 64.2305(d); *Rose*, 2022 WL 912967, at *2. Kemen alleges she does not use her phone for business. (Doc. 13-1, #170). And, as noted above, Kemen says she registered her cell phone to the national Do Not Call list in 2011 (Doc. 13-1, #170). Only residential numbers can be added to that list. *See Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 657 (W.D. Tenn. 2020). Put together, Kemen has alleged facts making it plausible that her cell phone is residential.

Next, then, is whether Cincinnati Bell called for a "telemarketing purpose." Telemarketing is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). Kemen alleges that she first submitted a quote request online before receiving four calls from Cincinnati Bell. (Doc. 13-1, #171–72). Kemen answered only the first and fourth calls, during which a Cincinnati Bell employee allegedly encouraged her to purchase the company's products and services. (Doc. 13-1, #171–72). Kemen also alleges her quote request did not authorize Cincinnati Bell to call to solicit her. (*Id.*).

Cincinnati Bell presses two challenges on this front: (1) the first call cannot be considered "telemarketing" because Kemen solicited that call when submitting an online quote request, and (2) Kemen cannot rely on the second and third calls because she did not answer them and so cannot attest to their purpose. (Doc. 14, #185–86).

Begin with the first call. There, no one disputes that Kemen spoke to a Cincinnati Bell employee who encouraged her to purchase some good or service. Rather, the parties dispute whether Kemen wanted the call and what that means for her claim. Cincinnati Bell believes that when a consumer invites a company to contact the consumer, like Kemen did here when requesting a quote, the resulting call cannot be made with a "telemarketing purpose." (Doc. 9, #93; Doc. 14, #186). For support, Cincinnati Bell points to cases like *Daniel v. Five Stars Loyalty, Inc.*, No. 15-cv-3546, 2015 WL 7454260, at *4 (N.D. Cal. Nov. 24, 2015), where the court held a text message sent to complete a customer-initiated transaction was not "telemarketing" under the TCPA. Cincinnati Bell also highlights a 2015 decision from the FCC recognizing that when a customer "requests and expects" a text message from a retailer, the reply text will not be considered "telemarketing." *In re Rules & Reg's Implementing the TCPA*, 30 FCC Rcd. 7961, 8015–16 (July 10, 2015).[3]

---

[3] The FCC stated, "we find that the on-demand text sent by retailers under the facts described by [Retail Industry Leaders Association or RILA] is not telemarketing, but instead fulfillment of the consumer's request to receive the text. As RILA describes it, the consumer requests the communication by sending an initial text request in response to a call-to-action marketing display. Immediately after receipt of the initial consumer request, the business sends an autodialed reply in the form of a one-time text message. When a consumer makes his or her initial request, the consumer requests and expects to receive the on-demand text message promptly in response, and expects the message to contain only the coupon requested." 30 FCC Rcd. at 8015.

Unfortunately, Cincinnati Bell does not fully explain the contours of (what the Court will call) its proposed "customer-initiated-contact exception," nor how it should apply to Kemen's § 64.1200(d) claim. Further—and unsurprisingly given the early stage of this proceeding—the Court currently lacks details about what Kemen *did* authorize when requesting the quote. For example, the Court does not know whether the webpage suggested that Kemen should expect a call, text, or letter, or that she would receive other solicitations. Pending a better understanding of this proposed exception, and a fuller recounting of the relevant facts, the Court concludes that the "customer-initiated-contact exception" does not necessarily render Kemen's § 64.1200(d) claim futile.

Cincinnati Bell's cited authority does not change that result. To start, *Daniel* is inapt. There, the text message merely "allow[ed] the recipient to complete a registration process" that the recipient set in motion. *Daniel*, 2015 WL 7454260, at *4. The *Daniel* court thus held the sender did not engage in "telemarketing" because helping to confirm or complete a pending transaction does not "encourage" a purchase. *Id.* at *4–5; 47 C.F.R. § 64.1200(f)(13). But Kemen's request did not start a transaction, so this principle does not apply.

Next, the FCC's 2015 decision also appears inapposite. The ruling expressly concerned the agency's "prior-express-written-consent rule," which allows a telemarketer to avoid TCPA liability when using "autodialers" to call or message consumers. 30 FCC Rcd. at 8015. Thus, the ruling looks related to § 64.1200(a)(2) and (f)(9). But Kemen's claim proceeds under a different regulation, § 64.1200(d).

6

Moreover, even assuming the FCC's 2015 ruling's language applied to Kemen's claim, that still does not help Cincinnati Bell. The FCC's ruling appears to simply recognize the commonsense distinction between communications designed to initiate a transaction on one hand, from those fulfilling a customer's request for information without further solicitation on the other. *See* 30 FCC Rcd. at 8015–16 (noting that after a consumer requested information, the reply text did "not include marketing material unrelated to the information specifically requested by the consumer"). The principle seems to rest on the implicit consent of the recipient. *See Reese v. Marketron Broadcast Solutions, Inc.*, No. 18-1982, 2018 WL 2117241, at *4–5 (E.D. La. May 8, 2018).

Here though, the Second Amended Complaint plausibly alleges Cincinnati Bell exceeded Kemen's limited consent to be contacted. Although Kemen used Cincinnati Bell's website to request a quote, Kemen says Cincinnati Bell called to market its products and services. That plausibly suggests that the telephone call went *beyond* merely communicating a response to the quote that Kemen requested. And perhaps confirming the mismatch between the call she received and the quote she requested, Kemen asked during that first conversation to no longer be called.

Finally, FCC ruling aside, FCC regulations also do not appear to carve out a "customer-initiated-contact exception" for internal do-not-call claims. More specifically, § 64.1200(d), which imposes the substantive standard for Kemen's claim, applies only to calls made and messages sent for "telemarketing purposes." And § 64.1200(f)(13)'s "telemarketing" definition does not explicitly exclude situations

7

where a customer requests a call. Compare that definition, for example, to the definition of "telephone solicitation." The FCC defines the latter as,

> the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, *but such term does not include a call or message … [t]o any person with that person's prior express invitation or permission.*

47 C.F.R. § 64.1200(f)(15) (emphasis added).

The FCC likewise bans calls "using an automatic telephone dialing system or an artificial or prerecorded voice" to certain categories of telephone numbers without "the prior express written consent of the called party," *id.* § 64.1200(a)(2), with the FCC also defining "prior express written consent," *id.* § 64.1200(f)(9). Finally, still other regulations prohibit some calls without prior consent, *id.* § 64.1200(a)(3), or preclude companies from sending an "unsolicited advertisement," *id.* § 64.1200(a)(4). All that is to say, if the FCC wanted to exclude customer-initiated calls from the scope of § 64.1200(d) or the definition of "telemarketing" generally, the agency knew how to accomplish that. Thus, the Court does not construe § 64.1200(d)'s coverage as limited in that regard.[4]

In short, it is at least plausible for now that, despite Kemen's quote request, Cincinnati Bell placed the first call with a "telemarketing purpose" as that phrase is used in § 64.1200(d). That is, Cincinnati Bell may have called to encourage Kemen to purchase a product or service, and Kemen's quote request does not change that—

---

[4] This perhaps makes some sense. Even if a customer at first wants to be "telemarketed," the telemarketer should still implement certain minimum procedures to cease further calls if customer changes their mind and requests to no longer be contacted.

either because, as a factual matter, the call exceeded the scope of the quote, or because, as a legal matter, the request for a quote did not preclude the call from constituting "telemarketing." The Court may, however, find otherwise after further legal and factual development.

As for the two unanswered calls, Kemen has plausibly alleged Cincinnati Bell placed them for a telemarketing purpose too. To start, unanswered calls can "count" for TCPA purposes. *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 589 (M.D. Tenn. 2018). And the allegations here give rise to a plausible inference that Cincinnati Bell placed the two unanswered calls for a telemarketing reason. Although Kemen did not pick up the second and third calls, she did answer the fourth call. (Doc. 13-1, #171–72). Critically, Kemen alleged the first and fourth calls followed the same "telemarketing" script (Doc. 13-1, #171–72), making it plausible the unanswered second and third calls did so, as well. *See Spurlark v. Dimension Srvs. Corp.*, No. 2:21-cv-3803, 2022 WL 2528098, at *3 (S.D. Ohio July 7, 2022) (inferring prior unanswered calls followed the same messaging as a later answered call); *Moore v. Healthcare Sols. Inc.*, No. 21-cv-4919, 2022 WL 17487823, at *4–5 (N.D. Ill. Dec. 7, 2022) ("[T]he content and timing of an answered call can allow the court to draw the reasonable inference that unanswered calls were sales solicitations from the defendant." (cleaned up and citations omitted)). For now, then, Kemen has adequately alleged that Cincinnati Bell made all four calls for telemarketing purposes—and she only needed to show two.

That leaves whether Cincinnati Bell had implemented minimum procedures at the time it called Kemen. As to this element, Kemen alleges Cincinnati Bell lacked procedures to "honor [her] do-not-call request within a reasonable time from the date of such request …. not to exceed thirty days …." (Doc. 13-1, #175–76); 47 C.F.R. § 64.1200(d)(3). For support, she notes she received four calls over twelve days. Cincinnati Bell argues that that is not enough to support a plausible inference that Cincinnati Bell did have the necessary procedures in place. (Doc. 14, #185). Indeed, Cincinnati Bell argues that Kemen's experience shows it *does* have such procedures. (*Id.* at #185–86).

To its credit, Cincinnati Bell stopped calling Kemen well within the thirty-day outer limit. (Doc. 13-1, #170–72). And the FCC has suggested that a company has adequate procedures where those procedures result in the company honoring an internal do not call request "within a few days or weeks." 18 FCC Rcd. At 14069. So perhaps on a fuller understanding of the record, the Court (or a jury) will conclude Cincinnati Bell had a policy in place designed to honor Kemen's request within a reasonable time.

But for now, Cincinnati Bell does not receive the benefit of the doubt; Kemen does. *See Bassett*, 528 F.3d at 430. And a twelve-day delay is long enough to support a plausible inference Cincinnati Bell lacked the requisite minimum procedures. In other words, the Court cannot decide, based solely on the pleadings, that Cincinnati Bell's internal do-not-call policies (assuming they exist) met the minimum standards, or that the twelve days that compliance took here was reasonable. *See Buja v.*

*Novation Cap., LLC*, No. 15-81002, 2017 WL 10398957, at *6 (S.D. Fla. Mar. 31, 2017) ("[T]his Court cannot conclude [from the pleadings] that Defendants' taking two or three weeks to honor a [do-not-call] request is reasonable as a matter of law.").

Rather, the existence of minimum procedures and the reasonableness of Cincinnati Bell's delay are factual matters better addressed at summary judgment. *See Boger v. Citrix Sys., Inc.*, No. 8:19-cv-01234, 2020 WL 1033566, at *5 (D. Md. Mar. 3, 2020); *Nece v. Quicken Loans, Inc.*, No. 8:16-cv-2605, 2017 WL 2865047, at *2 (M.D. Fla. Jan. 3, 2017). Therefore, Kemen's proposed Second Amended Complaint has plausibly alleged this element.

In sum, Kemen's Second Amended Complaint is not futile. The Court **GRANTS** Kemen's Motion for Leave to Amend (Doc. 13) and **ORDERS** she file her Second Amended Complaint (Doc. 13-1) on the Court's docket.

Finally, Cincinnati Bell argues Kemen lacks Article III standing to seek injunctive relief. (Doc. 14, #187). Cincinnati Bell maintains that Kemen has not plausibly alleged Cincinnati Bell will call her again, meaning she has no Article III injury-in-fact sufficient to demand injunctive relief. (*Id.*). In her Reply, Kemen did not address Article III. (*See* Doc. 16, #201–02). That is unfortunate. Article III establishes an irreducible constitutional minimum a plaintiff must meet as to each claim and every form of relief. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). Injunctive relief is no different. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *see also Johnson v. Jos. A. Bank Clothiers, Inc.*, No. 2:13-cv-756, 2015 WL 12698066, at *4–5 (S.D. Ohio June 9, 2015). Accordingly, the Court **ORDERS** Kemen

11

12

to brief whether this Court has Article III standing to grant her requested injunctive relief. Her brief must be limited to ten pages and must be filed **no later than June 9, 2023**. Cincinnati Bell may then respond in writing, not to exceed ten pages, **on or before June 23, 2023**.

As Kemen's claim will proceed on at least one theory of relief regardless, in the meantime Cincinnati Bell should file its Answer and the parties should promptly meet and confer under Federal Rule of Civil Procedure 26(f).

**SO ORDERED.**

May 24, 2023
**DATE**                                                    **DOUGLAS R. COLE**
                                                    **UNITED STATES DISTRICT JUDGE**